IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **MELVIN EDWARD LEE MARTIN,** ) | CASE NO. 7:19CV00760 |
| ) | |
| **Plaintiff,** ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| **LT. M. SHAW, <u>ET</u> <u>AL.</u>,** ) | By: Glen E. Conrad |
| ) | Senior United States District Judge |
| **Defendants.** ) | |

Plaintiff Melvin Edward Lee Martin, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that a jail official used excessive force against him, in violation of his constitutional rights. The case is presently before the court on the defendants' motion for summary judgment. After review of the record, the court concludes that the motion must be denied as to the issue of exhaustion of administrative remedies and granted as to the merits of the constitutional claims against the defendants.

I.

At the time Martin's claims arose, he was incarcerated at the Amherst County Adult Detention Center ("ACADC"), a facility operated by one of the defendants, the Blue Ridge Regional Jail Authority ("BRRJA"). Martin asserts two § 1983 claims: (1) on October 17, 2019, Lieutenant ("Lt.") Shaw used excessive force in responding to Martin's attempted suicide while he was a pretrial detainee;[1] and (2) BRRJA personnel interfered with Martin's medical care at the hospital and with his attempt to bring a criminal charge against Lt. Shaw.

---

[1] Court records submitted by the defendants indicate that Martin was detained on charges and was not convicted of any of those charges until after the events of October 17, 2019.

In support of their motion for summary judgment, Lt. Shaw and BRRJA offer the following evidence, which is undisputed, unless otherwise noted.[2] On October 17, 2019, Martin was confined in a cell by himself and attempted suicide by tying a piece of cloth around his neck while lying on his bunk. Lt. Shaw responded to a call for assistance to Martin's cell. Officers Putz and Hayes were already at the cell when Lt. Shaw arrived. Martin was fully awake and alert, but did not want to walk when Putz and Hayes brought him to his feet. The officers guided and carried Martin outside his cell into the dayroom, where Martin sat in a chair. Three nurses reported to the scene. Nurse Campbell assessed Martin's condition, but reported having difficulty taking vital signs at that time, because Martin refused to sit still.[3] Nurse Campbell determined that Martin should be transported to a local hospital, as required by BRRJA policy for any inmate who attempts suicide. Lt. Shaw directed Martin to stand up and move to a wheelchair standing a few feet from where Martin was seated. Martin did not comply with this order. Lt. Shaw repeated the order several times, but Martin continued his noncompliance.

At this point, Lt. Shaw utilized a compliance technique to urge Martin to stand up and move to the wheelchair—a technique he had learned during defense tactics training at the Central Virginia Criminal Justice Academy. Lt. Shaw stood behind Martin, placed a hand on the left side of his face, with the ridge of his thumb near the left corner of Martin's mouth and his other fingers extended near Martin's jawline. In this position, Lt. Shaw applied pressure to bring Martin's face against his chest, while repeating the command for Martin to stand up. Almost

---

[2] See Mem. Supp. Mot. Summ. J., ECF No. 18; Ex. 1, court records; Ex. 2, Shaw Decl.; Ex. 3, Putz Decl., Ex. 4, Rodgers Decl.; Ex. 5., Massie Decl. and medical records; Ex. 6, Schmitt Decl.; and Ex. 7, Lipscomb Decl.

[3] Martin asserts that he was not resisting the officers or the medical staff at any time. Nurse Campbell's notes indicate that, within fifteen minutes, she was able to complete a check of Martin's vital signs, which were normal.

immediately after Lt. Shaw applied this compliance technique, Martin stood up.[4] Once he did, the officers placed him into the wheelchair. During the application of the technique, Martin voiced no complaints that Lt. Shaw was twisting his neck or otherwise injuring him.[5] Lt. Shaw states in his sworn declaration that he utilized the compliance technique only to persuade Martin to stand and move to the wheelchair for transportation to the hospital.

Once Martin was in the wheelchair, Lt. Shaw wheeled him to the Intake area of the jail. While they were moving, Martin refused to sit back in the chair. To prevent Martin from falling out of the chair, Lt. Shaw held onto the back of the inmate's jumpsuit. During the entire trip, Martin was talking to the officers and did not voice any complaints that Lt. Shaw's actions were choking him. Martin states, "Lt. Shaw twisted the back of my jumper up at the neck restricting my breathing more. When I asked him why he stated so I don't play anymore games and fall[ out of] the chair." Am. Compl. 3, ECF No. 8.

Once they reached Intake, Lt. Shaw handed Martin off to BRRJA transportation officers, who escorted him to Lynchburg General Hospital. At the hospital, on October 18, 2019, Dr. William Moore examined Martin. The doctor's examination notes indicate his finding of "mild to moderate tenderness" in the neck with full range of motion, without skin disruption or swelling. Rogers Decl. ¶ 4; attached medical records. Martin states that although the doctor ordered ibuprofen and said he would be back to see Martin, he did not return; Martin claims that BRRJA officers told the doctor and nurses at the hospital that Martin "was faking." Am. Compl.

---

[4] Lt. Shaw states that he applied the technique no more than five seconds, discontinuing it as soon as Martin stood up. Martin claims that Lt. Shaw applied the technique for thirteen seconds, until Martin was seated in the wheelchair, and the video footage is quite blurry and is not clearly inconsistent with either of these time estimates.

[5] Martin states in the verified amended complaint, "Lt. Shaw wrapped his fore-arm around my face and twisted my neck so hard it cracked. Lt. Shaw th[e]n picke[d] me up while twisting my neck and sit me down in a wheelchair." Am. Compl. 3, ECF No. 8. He also states that Lt. Shaw "was being very vulgar" towards him. Id.

3, ECF No. 8. Later on October 18, 2019, officers returned Martin to the jail. Nurse Wayne Fanning examined Martin and found that his vital signs were normal.

On October 22, 2019, Nurse Deborah Massie examined Martin for his complaints of neck pain. She placed him on the BRRJA pain protocol, which called for a seven-day treatment with ibuprofen, which Martin completed. After October 22, 2019, despite later being seen by the medical staff for many other matters, Martin did not voice any further complaints about neck pain.

In late October 2019, Martin filled out a criminal complaint seeking to press a criminal charge that Lt. Shaw had assaulted him on October 17, 2019. A BRRJA officer took Martin's complaint to the state magistrate. Four days later, after reviewing the complaint, the magistrate talked with Martin and said that he had decided not to pursue a criminal charge against anyone.

## II.

### A. The Summary Judgment Standard.

The court should grant summary judgment only when the pleadings and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. On summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. Id. at 255. To be successful, the moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-

sided that one party must prevail as a matter of law." Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky., 93 F.3d 230, 233 (6th Cir. 1996).[6]

When a motion for summary judgment is made and is properly supported by affidavits, the nonmoving party may not rest on the mere allegations or denials in his pleadings. Anderson, 477 U.S. at 256. Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find in his favor. Id. at 256-57. Verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Where the plaintiff's version of events is so utterly discredited by unchallenged video footage that no reasonable jury could believe him, however, summary judgment is appropriate. See Scott v. Harris, 550 U.S. 372, 380-381 (2007) ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); accord Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) ("[W]here, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.").

### B. Exhaustion of Administrative Remedies.

Under 42 U.S.C. § 1997e(a), a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. This exhaustion requirement is "mandatory," Ross v. Blake, 136 S. Ct. 1850, 1856 (2016), and "applies to all inmate suits about prison life." Porter v. Nussle, 534 U.S. 516, 532 (2002). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the

---

[6] The court has omitted internal quotation marks, alterations, and/or citations here and throughout this opinion, unless otherwise noted.

facility provides to prisoners and meet all deadlines within that procedure. See Woodford v. Ngo, 548 U.S. 81, 90-94 (2006).

The defendants bear the burden of proving the affirmative defense that Martin failed to exhaust available administrative remedies regarding his claims before filing suit. Jones v. Bock, 549 U.S. 199, 216 (2007). If they do so, Martin may yet escape summary judgment under § 1997e(a) if he states facts showing that the remedies under the established grievance procedures were not "available" to him. Ross, 136 S. Ct. at 1859. Generally, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

The BRRJA has an established grievance procedure for inmates that has several steps. After attempting informal resolution of a problem, the inmate must ask the housing unit officer for a grievance form, complete a written grievance, and submit it to the officer, who will forward it to the site administrator of the facility. The site administrator will respond to the grievance in writing. If the inmate's issue is still unresolved, to exhaust available BRRJA grievance procedures, he must request a grievance appeal form from the housing unit officer, complete it, and mail it at his expense to the BRRJA administrator, Tim Trent, or his designee, at the address on the appeal form. The original grievances and appeal grievances, once received, are placed in a master file and entered into a grievance log, and a copy is returned to the inmate filer. "Once the inmate appeals to the BRRJA Administrator, he has exhausted all administrative remedies at the BRRJA." Lipscomb Decl. ¶ 6, ECF N. 18-7.

Martin filed a nearly illegible grievance form on October 26, 2019, complaining that Lt. Shaw had assaulted him after his attempted suicide on October 17, 2019, stating his intent to file a criminal charge against Lt. Shaw, and asking to be moved to a different facility. See Schmitt

Decl. ¶ 4, Attach. 1, ECF No. 18-6. Schmitt, the site administrator for ACADC, responded: "You filed a criminal complaint against an officer and it was taken to the magistrate. The magistrate decided to take no action. You will remain here." Id. at 2. A keeper of the master grievance file at BRRJA states in a sworn declaration, "Inmate Martin never submitted a grievance appeal regarding the allegations in the Amended Complaint. He did not exhaust his administrative remedies at the BRRJA." Lipscomb Decl. ¶ 7, ECF N. 18-7.

As stated, Martin's verified complaint and other pleadings, ECF Nos. 1 and 24, must be treated as affidavits for purposes of summary judgment. Martin states that one of his grievance forms—the appeal form that he mailed—was never returned to him. The BRRJA procedure does not include a method for an inmate to ensure that his appeal form was properly delivered to the appropriate office so that he could receive a response. Therefore, the court concludes that Martin's submissions create a material dispute as to whether he filed the required grievance appeal, thus completing the available steps of the BRRJA grievance procedure. The court will deny the defendants' motion on the ground of exhaustion.

### C. Excessive Force.

"[T]he Due Process Clause protects a pretrial detainee [like Martin] from the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015). Even in the "absence of an expressed intent to punish," a pretrial detainee may prevail in an excessive force claim if he shows "that the force purposely or knowingly used against him was objectively unreasonable." Id. at 396–97.

> A court (judge or jury) cannot apply this standard mechanically. Rather, objective reasonableness turns on the "facts and circumstances of each particular case." A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the legitimate interests that stem from the government's need to manage the facility in which the

> individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.
>
> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. at 397. This list is not exclusive, but merely illustrates "the types of objective circumstances potentially relevant to a determination of excessive force." Id. The court agrees that these factors weigh in favor of Lt. Shaw in this case.

Clearly, a need existed for the use of some force to persuade Martin to stand up and get into the wheelchair and to keep him from falling out of it so that he could be transported to the hospital for assessment after his attempted suicide. It is undisputed that Martin failed to comply with verbal commands to stand up voluntarily and move to the wheelchair. Martin himself states that he "was being complet[e]ly still with cuffs on" and "didn't move until [Lt.] Shaw and staff physically moved" him. Resp. 2, ECF No. 24. The video footage is consistent with this account, as it shows Martin, seated at the table, unmoving until Lt. Shaw assists him to do so. The video also shows Martin in the wheelchair, with his head and chest leaned far forward, and Lt. Shaw pushing the chair with one hand and apparently holding the back of Martin's jumpsuit with the other. The officers and Martin also offer evidence that he was able to talk during the wheelchair ride, making it unreasonable for any fact finder to be persuaded, as Martin alleges, that Lt. Shaw's grip on the back of his clothing significantly restricted his breathing.

The weight of the evidence also shows that Martin suffered no more than a de minimis injury to his neck, a factor that weighs in favor of a finding that Lt. Shaw used minimal force. Nurse Campbell's examination immediately after the attempted hanging found no red areas on

8

Martin's neck, with vital signs normal. The doctor's examination of Martin the next day showed "mild to moderate tenderness" in the neck, but with full range of motion, no skin disruption, and no swelling. No evidence suggests that any of the slight symptoms which medical personnel noted were a result of Lt. Shaw's actions, rather than the effect of Martin's own decision to tie a cloth around his neck in an attempted hanging. When Martin complained of neck pain on October 22, 2019, five days after the incident, the nurse provided pain medication for only a week, and he raised no further complaints about his neck.

The third factor—the officer's efforts to temper the force used—also weighs in Lt. Shaw's favor. The officer used a compliance technique designed for such situations, applying minimal force to convince the noncompliant Martin, for his own safety and benefit, to stand and move to the wheelchair. Lt. Shaw says he used the technique for five seconds, until Martin rose to his feet, while Martin says that Lt. Shaw used the technique for thirteen seconds, which would have covered the time the officers took to maneuver Martin into the wheelchair. Either of these timetables qualifies as a minimal use of force that was proportional to the situational needs. Similarly, Lt. Shaw applied minimal force, using Martin's own jumpsuit to keep him from falling forward out of the wheelchair during transport to the intake area. The amount of force used did not prevent Martin from talking and ceased when Lt. Shaw turned Martin over to other officers for transportation to the hospital.

The fourth, fifth, and sixth factors—the security problem, the threat the officer reasonably perceived, and the plaintiff's own actions—are, in this case, all centered on the threats presented by Martin's suicide attempt and subsequent refusal to follow orders. Lt. Shaw reasonably perceived that Martin, in attempting suicide, was a danger to himself and needed immediate evaluation at the hospital. At the same time, Martin was not following orders to get

9

into or to stay safely seated in the wheelchair. Again, Lt. Shaw's uses of force were focused on accomplishing these limited safety purposes for Martin's benefit.

Based on the foregoing, the court cannot find that Martin has presented any material disputed fact on which he could persuade a jury that Lt. Shaw's use of force against him was objectively unreasonable, in violation of the Fourteenth Amendment.[7] Rather, the court is satisfied that, in light of the parties' affidavits, the medical records, and the video footage, Lt. Shaw's uses of force against Martin on October 17, 2019, were proportionate to the threats of harm Lt. Shaw perceived and the need to move Martin to, and keep him seated in, the wheelchair for transport to the hospital for assessment after his suicide attempt. Accordingly, the court will grant the defendant's motion for summary judgment as to the excessive force claims against Lt. Shaw.[8]

### D. Claims against the BRRJA.

The court also concludes that the other defendant Martin has named, the BRRJA, is entitled to summary judgment on the excessive force claims. To state such a claim against the BRRJA, Martin must show that a BRRJA policy or custom caused Lt. Shaw to commit unconstitutional conduct against Martin. Milligan v. Newport News, 743 F.2d 227, 229 (4th Cir. 1984); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-92 (1978). Absent any evidence establishing an unconstitutional policy or custom, the BRRJA cannot be liable for its employees' unconstitutional actions, under a theory of respondeat superior, merely because the BRRJA

---

[7] In his response to the summary judgment motion, Martin states that he has not obtained all his evidence and asks for additional video footage, showing the officers entering his cell. He fails to show that he served requests for discovery for any additional evidence, however. Nor does he explain how any such additional evidence would be material to his claims against the defendants. It is undisputed that Lt. Shaw arrived at Martin's cell only after other officers had removed him from the cell. Thus, the court finds no indication that Martin was deprived of his ability to engage in discovery as needed to develop his claims in this case.

[8] Because the court grants summary judgment for Lt. Shaw on the merits of the Fourteenth Amendment claims, the court finds no need to address his additional defense of qualified immunity.

employs them. Monell, 436 U.S. at 691. Inasmuch as the court has concluded that Martin fails to present a triable claim of excessive force against Lt. Shaw, Martin also cannot establish a claim that any BRRJA policy or custom concerning the use of force is unconstitutional.

In Martin's remaining claims, he complains about other BRRJA officers' alleged interference with his ability to get a proper medical evaluation at the hospital and to pursue a criminal complaint against Lt. Shaw. Martin does not allege that Lt. Shaw had any personal involvement in either of these respects or that any BRRJA custom or policy caused the alleged interference with his medical care or legal efforts.[9] Therefore, the court concludes that the only defendants Martin has named in this lawsuit are entitled to summary judgment on the merits of his claims. An appropriate order will enter this day.

**ENTER**: This 19th day of February, 2021.

_____
Senior United States District Judge

---

[9] In any event, Martin has not stated facts showing that he was denied medical care for any serious medical need or that he was denied the chance to file his criminal complaint. He alleges that he did not receive ibuprofen from the doctor on October 18, 2019, but it is undisputed that Martin saw a nurse immediately upon his return to the BRRJA that same day and could have asked her for pain medication, as he did four days later. Moreover, Martin admits that he was able to file his criminal complaint and have it reviewed by the magistrate, and that official, not any BRRJA staff member, determined that no charge should be pursued. See Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) (holding private individual has no right to have another person criminally investigated and has "no judicially cognizable interest in the prosecution or nonprosecution of another").